1    MICHAEL A. JACOBS (CA SBN 111664)
     MJacobs@mofo.com
2    RICHARD S.J. HUNG (CA SBN 197425)
     RHung@mofo.com
3    MORRISON & FOERSTER LLP
     425 Market Street
4    San Francisco, California 94105-2482
     Telephone: 415.268.7000
5    Facsimile: 415.268.7522

6    Attorneys for Plaintiff
     AUTODESK, INC.

7

8                 UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10

11    AUTODESK, INC.,                   Case No.     14-cv-1409-ED

12             Plaintiff,              **AUTODESK'S OPPOSITION TO**
                                          **ZWSOFT'S MOTION TO ADOPT**
13        v.                          **THE HAGUE CONVENTION TO**
                                          **OBTAIN FOREIGN DISCOVERY,**
14    ZWCAD SOFTWARE CO., LTD., ZWCAD      **OR IN THE ALTERNATIVE, TO**
     DESIGN CO., LTD., HK ZWCAD SOFTWARE   **MODIFY THE PROTECTIVE**
15    LTD., and GLOBAL FORCE DIRECT, LLC.     **ORDER TO AVOID CONFLICTS**
     d/b/a ZWCADUSA,                         **WITH FOREIGN LAW**
16
            Defendants.
17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION ........................................................................................................... 1

STATEMENT OF FACTS .............................................................................................. 2

I.      AUTODESK CATCHES ZWSOFT COPYING AUTOCAD SOURCE
        CODE ................................................................................................................... 2

II.     AUTODESK SUES IN TWO COURTS, AND ZWSOFT SEEKS DELAY .................... 3

LEGAL STANDARD ...................................................................................................... 5

ARGUMENT ................................................................................................................... 6

I.      ZWSOFT HAS FAILED TO SHOW IT NEEDS ANY SPECIAL
        PROTECTION AGAINST DISCOVERY ................................................................ 6

        A.      There Is No Evidence that CAD Source Code and Related
                Documents Are Subject to Chinese State Secrecy or Privacy Laws
                or Otherwise Pertain to a Sovereign Interest ........................................ 6

        B.      Hague Convention Procedures Would Be Ineffective ........................... 9

        C.      Autodesk Has Not Even Served Discovery on ZWSOFT, Let Alone
                Overbroad Discovery ........................................................................... 10

        D.      Inspection in China Is Not an Adequate Substitute for Federal Rules
                Discovery ............................................................................................. 10

II.     ZWSOFT FAILS TO SHOW GOOD CAUSE TO AMEND THE
        PROTECTIVE ORDER ....................................................................................... 11

III.    THE COURT SHOULD ADMONISH ZWSOFT TO PRODUCE ITS
        SOURCE CODE TIMELY ................................................................................... 12

CONCLUSION ............................................................................................................. 13

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**CASES**

4

5

*Beckman Indus., Inc. v. Int'l Ins. Co.*,
966 F.2d 470 (9th Cir. 1992) ............................................................................................ 12

6

*Dong Ah Tire & Rubber Co., Ltd. v. Glasforms, Inc.*,
No. C 06-3359 JF (RS), 2008 U.S. Dist. LEXIS 116991 (N.D. Cal. Aug. 25, 2008) ............. 6

7

8

*Dynetix Design Solutions, Inc. v. Synopsys, Inc.*,
No.: C-11-05973 PSG, 2012 U.S. Dist. LEXIS 51724 (N.D. Cal. Apr. 12, 2012)................ 12

9

10

*Foltz v. State Farm Mut. Auto. Ins. Co.*,
331 F.3d 1122 (9th Cir. 2003)........................................................................................... 12

11

*In re Auto. Refinishing Paint Antitrust Litig.*,
358 F.3d 288 (3d Cir. 2004)................................................................................................ 5

12

13

*Milliken & Co. v. Bank of China*,
758 F. Supp. 2d 238 (S.D.N.Y. 2010) ................................................................................ 6

14

15

*Société Nationale Industrielle Aérospatiale v. United States Dist. Ct. for the S. Dist. of Iowa*,
482 U.S. 522 (1987) ................................................................................................*passim*

16

17

*Tiffany (NJ) LLC v. Andrew*,
No. 10 Civ. 9471 (RA) (HBP),
2012 U.S. Dist. LEXIS 160522 (S.D.N.Y. Nov. 7, 2012) ..................................................... 9

18

19

*Valois of Am., Inc. v. Risdon Corp.*,
183 F.R.D. 344 (D. Conn. 1997)..................................................................................... 5, 9

20

**RULES**

21

Fed. R. Civ. P.

22

Rule 26 ............................................................................................................................. 6
Rule 26(b) ....................................................................................................................... 12

23

Rule 26(c)........................................................................................................................ 12
Rule 26(f) .............................................................................................................. 4, 10, 12

24

Rule 34 ............................................................................................................................ 12

25

26

27

28

1

**INTRODUCTION**

2       In its "Motion to Adopt the Hague Convention[1]," ZWSOFT[2] seeks relief that is

3  breathtakingly broad.  ZWSOFT asks for permission to produce all of its Chinese documents only

4  "for inspection" in China.  It further proposes that Autodesk's U.S.-based attorneys and experts

5  be forced to conduct source code review exclusively in Beijing.  And it invites this Court to

6  abdicate its authority to compel discovery in this U.S. litigation—which involves U.S. copyrights,

7  U.S. trade secrets, and products sold in the U.S.—to the Supreme Court of the People's Republic

8  of China.  Such restrictions on discovery are incompatible with the Federal Rules and the timely,

9  orderly, and just resolution of this dispute.

10      ZWSOFT's motion does not come close to justifying these extraordinary protections.  It

11  rests on nothing but vague and unsupported attorney argument about Chinese state secret and

12  privacy laws.  If ZWSOFT were truly concerned about compliance with local law, it would have

13  specifically identified or described the state secrets or private information at issue—and then

14  submitted expert testimony to substantiate its claim that exporting such information would violate

15  Chinese law.  It also would have narrowly tailored its motion to cover only those particular

16  documents and things that contain genuine secrets or private information.  At the very least, it

17  would have ***alleged*** that its source code contains Chinese state secrets.

18      But it has done none of those things.  Instead, based only on a couple of news articles,

19  ZWSOFT essentially asks this court to take judicial notice that exporting any document or thing

20  relating to "science and technology" could violate Chinese law.

21      This motion is merely the latest in a string of obstructive tactics ZWSOFT has used since

22  Autodesk discovered its copyright infringement and trade secret misappropriation.  The motion

23  should be denied and ZWSOFT admonished to produce the accused source code at the

24  appropriate time according to the terms of the existing Protective Order.

25

26      [1] The "Hague Convention" refers to the Hague Convention on Taking Evidence Abroad in
27  Civil or Commercial Matters, Mar.18, 1970, 23 U.S.T. 2555, 847 U.N.T.S. 231.

      [2] As used herein, "ZWSOFT" refers to Defendants ZWCAD Software Co., Ltd. and
28  ZWCAD Design Co., Ltd. collectively.

1  **STATEMENT OF FACTS**

2  **I.   AUTODESK CATCHES ZWSOFT COPYING AUTOCAD SOURCE CODE**

3       Autodesk's allegations are set out in its Amended Complaint.  (Dkt. No. 62.)  Autodesk is

4  a Bay Area-headquartered pioneer and industry leader in computer-aided design ("CAD")

5  software.  (Complaint, ¶¶ 1, 12.)  Autodesk's products are used by more than 12 million people

6  worldwide, with AutoCAD its largest revenue-generating product.  (*Id*.)

7       For over a decade, ZWSOFT of Guangzhou, China apparently sold a competing CAD

8  software product called "ZWCAD."  ZWCAD originally was based on licensed third party code

9  called IntelliCAD.  (*Id*., ¶¶ 2, 3, 20.)  In 2012, however, ZWSOFT announced a new program

10  called "ZWCAD+."  ZWSOFT claimed that ZWCAD+ used an entirely new codebase and "core"

11  that it designed internally.  ZWCAD+ also touted ZWCAD+ as offering "a working environment

12  almost identical to AutoCAD" and as the "Closest AutoCAD Experience."  (*Id*., ¶¶ 19, 23.)

13       But the similarities between the "new" ZWCAD+ and AutoCAD were too close for

14  ZWCAD+ to have been developed independently.  As any schoolteacher knows, the way to catch

15  a suspected cheater is not to find similarities among the right answers, but among the wrong ones.

16  That is exactly what Autodesk has done.  It started with known bugs, errors, and idiosyncrasies in

17  its own AutoCAD programs and tried to find them in ZWCAD+.  Lo and behold, ZWCAD+

18  contains a host of bugs, errors, and idiosyncrasies that could have been introduced only via

19  ZWSOFT's wholesale copying of large portions of Autodesk source code.  (*Id*., ¶¶ 24, 25, 26.)

20       For example, compared to Autodesk's AutoCAD 2007 and 2008, ZWCAD+ makes the

21  same mistakes when filling in shapes.  (*Id*., ¶ 26.)  It makes the same mistakes when trimming

22  certain shapes.  (*Id*.)  When plot jobs are processed in ZWCAD+ 2012, a pop-up box informs

23  users "Your job is being processed in the background," just like in AutoCAD 2007 and 2008.

24  (*Id*., ¶ 30.)  Unlike AutoCAD 2007 and 2008, however, ZWCAD+ 2012 *lacks* background plot

25  processing —such that the statement makes no sense.  ZWCAD+ also responds to the same

26  unpublished commands Autodesk built into AutoCAD during the testing phase.  (*Id*.. ¶ 32.)  It

27  even contains some of the same typos.  Just like AutoCAD 2007 and 2008, ZWCAD+ warns

28

1   users who try to edit a locked shape that the "Associatve" entity is on a frozen layer.  (*Id.*)  The

2   list goes on and on.[3]

3   ## II.    AUTODESK SUES IN TWO COURTS, AND ZWSOFT SEEKS DELAY

4           Despite this compelling evidence, ZWSOFT denied (and continues to deny) copying any

5   portion of Autodesk code.  Autodesk therefore sued ZWSOFT in this case and in the Hague

6   District Court in the Netherlands in early 2014.  (Declaration of Richard S.J. Hung in Support of

7   Autodesk, Inc.'s Opposition to ZWSOFT's Motion to Adopt the Hague Convention to Obtain

8   Foreign Discovery. ("Hung Decl."), ¶¶ 2, 9.)

9           The Dutch action proceeded first.  Reviewing the evidence described above, the Dutch

10  court concluded that "the combination of the[] many aspects of similarity between ZWCAD+ and

11  AutoCAD raises questions" and that there is good cause for source code to be inspected.  (*Id.*,

12  Ex. 4 (Judgment in Preliminary Relief Proceedings of April 7, 2014) § 4.8.)  ZWSOFT opposed

13  discovery of source code outside of China on grounds of national security.  (*Id.*, ¶ 10)

14          In an ultimately unsuccessful attempt to expedite the proceedings, Autodesk agreed that

15  ZWSOFT could deposit source code in China for purposes of the Dutch action.  The Dutch court

16  then ordered ZWSOFT to "surrender [its] source code . . . of ZWCAD+ 2012 and ZWCAD+

17  2014," "including the 'build and mastering scripts, third party binary components and libraries,"

18  to a custodian in China.  (*Id.*, Ex. 4 §§ 4.15, 4.16; Ex. 5 (Judgment in the Summary Proceedings

19  of May 12, 2014) §§ 3.2, 3.3.)

20          Currently pending is a second Dutch action seeking the review of the source code by a

21  court-appointed neutral.  (Hung Decl., ¶ 11.)  Autodesk's October 2014 motion to appoint such an

22  expert is before the Dutch court.  (*Id.*)  As a result, no expert has yet been appointed in the Dutch

23  case and no source code reviewed.  Indeed, Autodesk does not even know how much source code

24  ZWCAD has deposited in China and in what condition.  (*Id.*, ¶ 12.)

25          Meanwhile, ZWSOFT has been doing its best to keep this U.S. suit from moving forward.

26  Its distributor, ZwcadUSA, was served and answered on June 6, 2014.  (Dkt. Nos. 16, 22.)

27  _____

28          [3] Additional examples confirming ZWSOFT's widespread copyright infringement and trade secret misappropriation are detailed in the Amended Complaint.  (Dkt. No. 62.)

1   ZwcadUSA agreed to proceed before Magistrate Judge Laporte and a case management and

2   pretrial order issued July 2, 2014.  (Dkt. No. 31.)  Judge Laporte also entered a stipulated

3   protective order patterned on the Northern District Model Protective Order and to which both

4   Autodesk and ZwcadUSA contributed.  (Dkt. No. 34.)

5        Autodesk attempted to serve Chinese Defendant ZWSOFT under the Hague Service

6   Convention.[4]  (Hung Decl., ¶ 3.)  On September 19, according to Hague Service Convention

7   procedures, the complaint finally arrived at ZWSOFT.  (*Id*., ¶ 4.)  ZWSOFT then refused to

8   accept service.[5]  (*Id*., ¶ 5.)  Five days later, after Autodesk sent letters threatening to move for

9   default, ZWSOFT finally contacted counsel for Autodesk to offer to waive service.  (*Id*., ¶ 7.)

10  Autodesk agreed to accept the waiver conditioned on ZWSOFT's agreement to answer by

11  October 12, 2014.  (*Id*.)  ZWSOFT ignored that condition and ***unilaterally*** filed waiver forms

12  omitting that requirement on October 7, 2014.  (*Id*.)  As a result, the Court set ZWSOFT's

13  deadline for filing responsive pleadings as December 10, 2014.  (*Id*.)

14       When it finally appeared, instead of answering, ZWSOFT moved to dismiss on the ground

15  that Autodesk's highly-detailed, eighteen-page complaint was insufficient to put it on notice of

16  the basis of Autodesk's claims.  (Dkt. No. 48.)  That motion is presently scheduled to be heard

17  April 30, 2015.  ZWSOFT also declined magistrate judge jurisdiction, causing all hearing dates

18  and scheduling orders to be vacated.  (Dkt. Nos. 40, 44.)

19       ZWSOFT's procedural tactics regarding service and its motion to dismiss apparently are

20  just the start of its delay tactics.  Despite being offered a month's worth of available dates for

21  conducting the Rule 26(f) conference, ZWSOFT has insisted on delaying the conference until

22  almost the last possible week to prevent Autodesk from serving discovery.  (Hung Decl., ¶ 8.)

23  And yet despite claiming an inability to hold the Rule 26(f) conference on any date between

24  December 19, 2014 and January 25, 2015, ZWSOFT filed this motion seeking to preempt any

25  _____

26       [4] The "Hague Service Convention" refers to the Hague Convention on the Service Abroad
    of Judicial and Extrajudicial Documents in Civil or Commercial Matters, Nov. 15, 1965, 20
27  U.S.T. 361, 658 U.N.T.S. 163.

28       [5] Autodesk learned about the refusal of service on December 15, 2014, when it received
    certificates of refusal from the Chinese Central Authority.

1   U.S. discovery of its source code and Chinese documents just days before Christmas.  (Dkt. No.
2   52.)

3                                    **LEGAL STANDARD**

4          Discovery in this action is governed by the Federal Rules of Civil Procedure, not the
5   Hague Convention.  Now that ZWSOFT has (at last) been brought within this Court's
6   jurisdiction, nothing in the Hague Convention deprives the Court of its ordinary powers to compel
7   ZWSOFT to produce documents.  *See Société Nationale Industrielle Aérospatiale v. United*
8   *States Dist. Ct. for the Southern Dist. of Iowa*, 482 U.S. 522, 539-40 (1987) (the Hague
9   Convention does not deprive that court of the jurisdiction it would otherwise possess "to order a
10  foreign national party before it to produce evidence physically located within a signatory
11  nation").

12         While this Court may, ***in its discretion***, choose to follow Hague Convention procedures,
13  the burden falls on ZWSOFT to prove those procedures are necessary.  *See, e.g.*, *In re Auto.*
14  *Refinishing Paint Antitrust Litig.*, 358 F.3d 288, 305 (3d Cir. 2004) (citing *Aérospatiale*, 482 U.S.
15  at 547 (stating that foreign litigants should "demonstrate appropriate reasons for employing
16  Convention procedures")).  Although there is no bright-line test, courts are invited to consider
17  "each [] of the particular facts, sovereign interests, and the likelihood that resort to [Hague
18  Convention] procedures will prove effective."  *Aérospatiale*, 482 U.S. at 544; *see also Valois of*
19  *Am., Inc. v. Risdon Corp.*, 183 F.R.D. 344, 346 (D. Conn. 1997).

20         The five-factor Restatement comity analysis that ZWSOFT claims has been "adopted" by
21  "District Courts in New York" does not apply here.  (*See* Dkt. No. 52, Mot. at 13.)  The district
22  courts in those cases used the Restatement factors to analyze whether to order foreign entities to
23  produce specific categories of documents.  This motion does not involve specific document
24  requests.  Rather, ZWSOFT asks the Court broadly to substitute Hague Convention discovery
25  procedure for the procedure provided by the Federal Rules.  The first four factors of the
26  Restatement analysis (importance of the documents to the litigation, degree of specificity of the
27  request, origin of the information, and availability of alternative means of securing the
28  information) cannot be analyzed in the absence of specific document requests.  The fifth factor

1    (balance of national interests) is redundant of the three *Aérospatiale* factors cited above.

2    Accordingly, Autodesk's analysis below follows the framework of the three factors enunciated in

3    *Aérospatiale*.  The result would have been the same under the Restatement factors, to the extent

4    they are relevant.

5                                              **ARGUMENT**

6    **I.    ZWSOFT HAS FAILED TO SHOW IT NEEDS ANY SPECIAL PROTECTION
          AGAINST DISCOVERY**

7

8            Every day in federal courts across the nation, foreign litigants produce documents and

9    deposit source code according to the Federal Rules subject to protective orders such as the one

10   already in place in this case.  *See*, *e.g.*, *Milliken & Co. v. Bank of China*, 758 F. Supp. 2d 238, 250

11   (S.D.N.Y. 2010) (denying Chinese bank's motion for a protective order ordering production

12   under Rule 26 of the Federal Rules of Civil Procedure, instead of the Hague Convention); *Dong

13   Ah Tire & Rubber Co., Ltd. v. Glasforms, Inc.*, No. C 06-3359 JF (RS), 2008 U.S. Dist. LEXIS

14   116991, 6-7 (N.D. Cal. Aug. 25, 2008) (ordering Chinese supplier to produce all relevant internal

15   email and between the company and its U.S. distributor).  This case should be no different.

16   ZWSOFT's motion falls far short of demonstrating that Chinese state secrecy or privacy laws

17   warrant special treatment for ZWSOFT's documents and source code.

18         **A.    There Is No Evidence that CAD Source Code and Related Documents Are
               Subject to Chinese State Secrecy or Privacy Laws or Otherwise Pertain to a
               Sovereign Interest**
19

20           ZWSOFT's vague and unsupported claims about Chinese law boil down to the facially

21   implausible argument that no documents and things relating to "science and technology" can be

22   exported from China without violating Chinese state secrecy and privacy laws.  But ZWSOFT

23   fails to explain exactly what state secrets or private information may be at issue here.  Citing only

24   articles published by the Sedona Conference and China Business Review, ZWSOFT claims

25   broadly that much "ordinary business information" may be a "state secret" under Chinese law.

26   (Mot. at 7-8.)  Without any expert declaration or any other authority accessible to this Court,

27   ZWSOFT's brief says Article 2 of the State Secrets Law defines state secrets as those having a

28   "vital bearing on state security and national interests . . ."  (*Id*. at 8.)  It goes on to claim that

1  under Article 8, this "seemingly tight definition" is expanded to cover, among other things,

2  everything to do with "science and technology." (*Id*. at 8-9.)  As for "privacy," ZWSOFT does

3  not even purport to offer a definition, simply arguing that the standard is "amorphous." (*Id*. at 9.)

4  Even assuming ***all*** of these claims about Chinese law to be true, they are wholly

5  inadequate to establish a need for the broad relief ZWSOFT requests.  By ZWSOFT's reasoning,

6  no Chinese company could ever be compelled to produce any documents in U.S. litigation for

7  fear of violating "amorphous" privacy laws.  Likewise, no Chinese company would ever be

8  compelled to produce any documents relating to "science and technology" for fear of violating

9  state secret laws.  But generalized concerns about liability in China cannot validly excuse a party

10  from discovery under the Federal Rules.   That is especially true where, as here, ZWSOFT fails to

11  describe the state secrets or private information at issue or even to allege that there are any.

12  The Court should not credit ZWSOFT's overblown claims about Chinese law.  The

13  declaration of Hui Zhang, submitted with this opposition, responds to the Chinese law issues

14  raised in ZWSOFT's motion.  (*See* Declaration of Hui Zhang in Support of Autodesk, Inc.'s

15  Opposition to ZWSOFT's Motion to Adopt the Hague Convention ("Zhang Decl.").)  Mrs. Zhang

16  is a former intellectual property judge of the Supreme People's Court of the People's Republic of

17  China and an intellectual property attorney.  (*Id*., ¶ 2.)  As Ms. Zhang explains, Chinese law does

18  not have a broad prohibition against depositing source code developed by Chinese companies

19  outside of China.  (*Id*., ¶ 10.)   Nor is there a broad prohibition in China against exporting

20  documents relating to "science and technology." (*Id*., ¶ 11.)  While there is a prohibition against

21  exporting materials containing state secrets, there is no case in which CAD software or

22  documents relating to CAD software have been found to contain state secrets.  (*Id*., ¶ 15.)

23  Indeed, the only information that is normally considered state secret is information

24  prepared by government agencies or is related to a government-funded project.  (*Id*., ¶ 14.)

25  Moreover, the information must be designated as a state secret by the National Administration of

26  State Secrets or other competent government agencies.  (*Id*., ¶ 13.)  ZWSOFT does not allege that

27  here.  Rather, it vaguely asserts that "the PRC ***may*** consider ZWCAD or ZWCAD+ software

28  source code to be or contain state secret information." (Mot. at 9.) (emphasis added).

1   Mrs. Zhang's declaration constitutes the *only* actual evidence of Chinese law before the Court on

2   this motion.[6]

3        Moreover, the two Chinese cases cited by ZWSOFT are readily distinguishable.  The

4   distinctions from the *Xue Feng* case are obvious.  That case involves purchasing and exporting of

5   data on China's oil industry.  Xue Feng allegedly received documents on geological conditions of

6   onshore oil wells and a database that gave the coordinates of more than 30,000 oil and gas wells

7   belonging to China National Petroleum Corporation, a government-owned company, and its listed

8   subsidiary PetroChina Ltd. (Zhang Decl., ¶¶ 17, 18.)  Xue Feng then allegedly sold the

9   information to a U.S. energy company.  (*Id.*, ¶ 18.)

10       This case, by contrast, involves no state secrets.  ZWSOFT, a private Chinese company,

11  will be asked to produce its own source code, as well as relevant documents in its possession, for

12  the sole purpose of litigation under a court sanctioned protective order, which complies with

13  Federal Rules of Civil Procedure.

14       The *Peter Humphrey* case also is inapposite.  That case concerned tactics for obtaining

15  personal information, such as household records and cell phone usage information.  (*Id.*, ¶ 23.)

16  Peter Humphrey and his wife were accused of illegally purchasing, selling, and providing

17  personal information on citizens while conducting background checks and internal investigations

18  for their corporate clients.  (*Id.*, ¶ 23.)  The *Peter Humphrey* case is irrelevant to the current

19  litigation, which will not involve discovery related to such personal records.

20       Thus, there is no evidence of a genuine sovereign interest at issue, nor is there any logical

21  reason to believe that such interests exist.  There also is no reason to believe that the documents

22  and source code at issue here are different from those in any other case involving Chinese

23  technology companies.  The absence of any demonstrated special sovereign interest weighs

24  heavily against ZWSOFT's proposed "compromise" of using Hague Convention Procedures.  *See*

25  *Aérospatiale*, 482 U.S. at 544 (directing courts to weigh "the sovereign interests").

26  

27       [6] Should ZWSOFT regret its failure to support its motion with expert testimony and do so
     in support of its reply, such new evidence should be stricken and not considered.  There is no
     reason why ZWSOFT could not have submitted such evidence with its opening brief and

28   Mrs. Zhang's declaration does not raise any new issues.

1

## B. Hague Convention Procedures Would Be Ineffective

2      Hague Convention procedures are not an effective substitute for discovery under the

3 Federal Rules.  First, the scope of Hague Convention discovery is potentially far too narrow—and

4 the procedures far too burdensome to the parties and the Court—to be effective in this case.  To

5 obtain discovery under the Hague Convention, the district court must submit a Letter of Request

6 to the Central Authority in China, who will forward the letter to the Supreme People's Court.

7 Hague Evidence Convention, art. 2; *see also Tiffany (NJ) LLC v. Andrew*, No. 10 Civ. 9471 (RA)

8 (HBP), 2012 U.S. Dist. LEXIS 160522 at *5 (S.D.N.Y. Nov. 7, 2012); (Zhang Decl., ¶ 9.)  The

9 Chinese court system then executes only those requests that it deems conform to the provisions of

10 the convention. (*Id.*, ¶ 9.); *see also Tiffany*, 2012 U.S. Dist. LEXIS 160522 at *5.  The PRC has

11 declared that it will order discovery of only those documents clearly enumerated in Letters of

12 Request and meeting the "direct and close connection" test.  *Id.* at *4.  As ZWSOFT admits in its

13 opening motion, the PRC Supreme Court may limit discovery to documents with a "direct and

14 close connection with the subject matter of the litigation."  (Mot. at 11.)

15      If Hague Convention discovery applied to this case, ZWSOFT could use those procedures

16 to thwart Autodesk's discovery and confirmation of the full extent of ZWSOFT's copying.  For

17 example, ZWSOFT may attempt to limit its production of source code to only those portions of

18 code directly relating to the common bugs, errors, and idiosyncrasies specifically called out in

19 Autodesk's complaint.  Of course, Autodesk does not contend that ZWSOFT copied only the

20 bugs.  Rather, identical bugs are merely the outwardly detectable signs of wholesale copying of

21 the underlying code.

22      Second, discovery under the Hague Convention would be far too slow to be effective.

23 Courts have "generally recognized that procedures under the Hague Convention are far more

24 cumbersome than under the Federal Rules of Civil Procedure."  *See*, *e.g.*, *Valois of Am.*,

25 183 F.R.D. at 349.  The entire process may take months, and the requesting party may or may not

26 obtain the documents requested.  *Tiffany*, 2012 U.S. Dist. LEXIS 160522 at *3 (stating that

27 plaintiffs submitted their Hague Convention application to China's Central Authority in

28 November 2011, and received a response and some of the documents requested in August 2012).

Thus, discovery in China would be too narrow, slow, and unpredictable to be an effective substitute for Federal Rules discovery. This also weighs heavily against the use of Hague Convention procedures under the *Aérospatiale* test. *See* 482 U.S. at 544 (directing the courts to consider "the likelihood that resort to [Hague Convention] procedures will prove effective").

### C. Autodesk Has Not Even Served Discovery on ZWSOFT, Let Alone Overbroad Discovery

As of the filing of this opposition, Autodesk has not yet served any discovery on ZWSOFT. Eager to begin, Autodesk has repeatedly asked ZWSOFT to join a Rule 26(f) conference—offering multiple dates of availability, but ZWSOFT has refused. (Hung Decl. ¶ 8.) Having frustrated Autodesk's ability to serve any discovery on it, ZWSOFT has no basis to complain that Autodesk discovery requests are overbroad or to cite those hypothetical requests as grounds for ordering Hague Convention discovery.

In an attempt to skirt this problem, ZWSOFT points to document requests propounded on its distributor, ZwcadUSA. (Mot. at 5.) That is a red herring. ZwcadUSA is a much smaller entity with only three known employees. The entirety of ZwcadUSA's business appears to be directed to the subject matter of this lawsuit. Accordingly, there is no need to narrow Autodesk's discovery requests to ZwcadUSA, as the responsive information that it possesses is both highly relevant and very limited. Indeed, based on ZwcadUSA's document productions and communications between the parties, ZwcadUSA apparently possesses only a ***few hundred documents in total*** that may be responsive to Autodesk's requests.

### D. Inspection in China Is Not an Adequate Substitute for Federal Rules Discovery

With respect to source code, ZWSOFT argues that the parties should use the code that ZWSOFT has allegedly already deposited with a third party in Beijing as a substitute for production under the procedures set forth in the existing stipulated Protective Order. With respect to documents, ZWSOFT argues that production for inspection would be more efficient because the documents will be predominantly written in Chinese and that a "native speaker" can more efficiently review them in China. (Mot. at 6.) Neither of these arguments makes sense.

1   Inspecting source code in China would be far more expensive than inspecting it in the

2   United States.  The code deposit in China is for use by a neutral expert appointed by the Dutch

3   court.  It has been over two months since Autodesk submitted candidates to the Dutch court,

4   however, and none has yet been appointed.  No review has occurred in Beijing and Autodesk

5   does not even know how much code ZWSOFT has made available there.

6   For the U.S. case, by contrast, Autodesk (and presumably ZWSOFT) will be relying on

7   local attorneys and party-appointed experts.  It is likely that multiple rounds of source code

8   review will be necessary before discovery is concluded.  If the initial deposit of source code

9   proves to be inadequate (as is often the case), there may be related motion practice required as

10  well.  It would be far more burdensome for the parties to ship their lawyers and experts back and

11  forth from the United States to Beijing than it would be to simply ship the source code here.

12  As for other ESI, ZWSOFT is of course free to conduct its initial review for production in

13  China using local document reviewers.  And after production, it is up to Autodesk to review that

14  information.  Autodesk is confident it can find an ample supply of Chinese-speaking document

15  reviewers here in the United States.  But there is no requirement that ZWSOFT "translate[] [the

16  documents] before potential production in this litigation."  It would be astronomically expensive

17  to require Autodesk attorneys to travel to Beijing every time they want to review the production

18  set.  There is no cause justifying such an extraordinary expense.  By comparison, shipping

19  ZWSOFT data here is almost free.

20  ## II.    ZWSOFT FAILS TO SHOW GOOD CAUSE TO AMEND THE PROTECTIVE

21  ORDER

22  ZWSOFT requests that the court amend the existing stipulated protective order, inter alia,

23  to require that data be collected, processed, and reviewed in China, and that data be made

24  available for inspection in China.  ZWSOFT, which bears the burden of establishing good cause

25  exists for the amendment, fails to show that producing data in the United States would cause a

26  specific prejudice or harm.  ZWSOFT's arguments consist of conclusory statements and non-

27  binding or tangentially relevant legal authorities, such as proposed amendments to the Federal

28

1   Rules of Civil Procedure, that do not satisfy the Rule 26(c) test.[7] *See Beckman Indus., Inc. v. Int'l*

2   *Ins. Co.*, 966 F.2d 470, 476 (9th Cir. 1992) ("[B]road allegations of harm, unsubstantiated by

3   specific examples or articulated reasoning do not satisfy the Rule 26(c) test").

4       Although ZWSOFT cites the risk that code could be copied or stolen, it fails to explain

5   why the existing Protective Order is inadequate to guard against that risk.  Nor does it give

6   specific reasons why its proposed provisions offer more protection.  The existing Order is based

7   on the Court's Model Protective Order, which the Court treats "as setting forth presumptively

8   reasonable conditions regarding the treatment of highly confidential information." *Dynetix*

9   *Design Solutions, Inc. v. Synopsys, Inc.,* No.: C-11-05973 PSG, 2012 U.S. Dist. LEXIS 51724, 4-

10  5 (N.D. Cal. Apr. 12, 2012) (citations omitted).  Its distributor, ZwcadUSA, also commented and

11  contributed to the stipulated order.  Absent any articulated reasoning, broad allegations of harm

12  do not warrant an amendment of the Protective Order.

13  **III.   THE COURT SHOULD ADMONISH ZWSOFT TO PRODUCE ITS SOURCE
          CODE TIMELY**

14

15      If the Court denies ZWSOFT's motion, then it should admonish ZWSOFT not to delay

16  producing the accused source code according to the terms of the existing Protective Order.

17      By the time the Court hears this motion, the Rule 26(f) conference will have occurred,

18  discovery will have been propounded, and ZWSOFT will be preparing objections.  With respect

19  to its source code, however, ZWSOFT has already presented its objections in this motion.

20  ZWSOFT chose to jump the gun and moved to preclude source code discovery.  In view of the

21  Court's crowded docket, there is no reason to await ZWSOFT's filing of a second discovery

22  motion raising the same issues again.

23      Accordingly, if ZWSOFT's motion fails, there is no reason for further delay.  The sooner

24  the source code is produced, the sooner ZWSOFT's wholesale copying of AutoCAD code will be

25  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

26      [7] ZWSOFT cites *Aérospatiale* test and certain sections of Rule 26(b) and Rule 34, as well
     as proposed amendments to some of these Rules.  Because this is a Rule 26(c) motion, the Rule

27  26(c) test applies: whether ZWSOFT meets its burden of showing good cause, i.e., demonstrating
     specific prejudice or harm will result if the protective relief is not granted.  *Foltz v. State Farm*

28  *Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1130 (9th Cir. 2003) (citing *e.g.*, *Beckman Indus., Inc. v. Int'l*
     *Ins. Co.*, 966 F.2d 470, 476 (9th Cir. 1992)).

1    revealed.  And if there really were some innocent explanation for why ZWCAD+ has the same

2    bugs, errors, and typos as AutoCAD 2007 and 2008, then its source code production would allow

3    ZWSOFT to exonerate itself.  Either way, ensuring timely source code production is the best

4    means available to precipitate the efficient resolution of this dispute.

5                                            **CONCLUSION**

6            ZWSOFT's request for conducting discovery under the Hague Convention, or

7    alternatively to amend the Protective Order is meritless.  It is merely another delay tactic to stall

8    litigation and is designed to deny Autodesk's access to ZWCAD+ source code, which ZWSOFT

9    knows is based on Autodesk's proprietary source code.  Autodesk therefore respectfully urges the

10   Court to deny ZWSOFT's motion and to admonish ZWSOFT to produce ZWCAD+ source code

11   without delay.

12

13   Dated: January 16, 2015                    MICHAEL A. JACOBS
                                                RICHARD S.J. HUNG
14                                              MORRISON & FOERSTER LLP

15

16                                              By:      */s/ Richard S.J. Hung*
                                                        RICHARD S.J. HUNG
17

18                                              Attorneys for Plaintiff
                                                AUTODESK, INC.

19

20

21

22

23

24

25

26

27

28